1  Arlo García Uriarte, SBN 231764
2  LIBERATION LAW GROUP, P.C.
   2760 Mission Street
3  San Francisco, CA 94110
   Telephone: (415) 695-1000
4  Facsimile: (415) 695-1006
   arlo@liberationlawgroup.com
5
6  Attorneys for Plaintiffs
   **Elias Yamido**
7  **Mark Sibayan**
   **Thelma Yamido**
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12 | ELIAS YAMIDO, MARK SIBAYAN | Case No. 3:19-cv-00344-RS
   | and THELMA YAMIDO, on behalf of |
13 | themselves, others similarly | CLASS ACTION
14 | situated, and the general public, |
   |                                   | **NOTICE OF MOTION AND MOTION**
15 |            Plaintiffs,            | **FOR FINAL APPROVAL OF CLASS**
   |                                   | **ACTION SETTLEMENT**
16 |       v.                          |
   |                                   | Hearing Date: November 19, 2020
17 | FLYING FOOD GROUP, LLC and        | Time: 1:30 PM
   | DOES 1-10, inclusive,             | Courtroom: 5
18 |                                   | Action filed: December 14, 2018
19 |            Defendant.             |
20 |                                   | **Hon. Richard Seeborg**
21

22

23

24

25

26

27

28

## NOTICE OF MOTION

TO EACH PARTY AND TO COUNSEL FOR EACH PARTY OF RECORD: NOTICE IS HEREBY GIVEN that on November 19, 2020, at 1:30 PM or as soon thereafter as counsel may be heard, Plaintiffs Elias Yamido, Mark Sibayan, and Thelma Yamido ("Plaintiffs") will move for an order granting final approval of the class action settlement between Plaintiffs and Defendant Flying Food Group, LLC.

This motion will be made and based upon: (1) this notice of motion; (2) the memorandum of points and authorities in support thereof; (3) the declaration of Arlo Garcia Uriarte and the exhibits attached thereto, all of which are filed and served concurrently herewith; as well as (4) the records, pleadings, and papers on file in this action, and upon such other matters as may be presented at the time of hearing on this motion.

Dated: October 29, 2020

_____
Arlo Garcia Uriarte
Liberation Law Group, P.C.
Attorneys for Plaintiffs

# *Table of Contents*

I.    INTRODUCTION.................................................................................1

II.   PROCEDURAL POSTURE, INFORMATION EXCHANGE, AND MEDIATION....2

III.  OVERVIEW OF THE SETTLEMENT AGREEMENT .................................4

IV.   FINAL SETTLEMENT APPROVAL SHOULD BE GRANTED .......................5

    A.   Class Action Settlements Are Generally Favored.................................5

    B.   Class Action Settlements Should Be Fair, Reasonable, and Adequate .................5

    C.   All Relevant Factors Weigh in Favor of Final Approval .........................6

        1.   The Parties Reached the Proposed Settlement After Arm's Length Negotiations ..7

        2.   Substantial Investigation Supports Plaintiffs' Recommendation of the Settlement..................................................................................................8

        3.   Class Counsel is Experienced and Endorses the Settlement...................9

        4.   Class Member Reaction Has Been Very Positive...................................9

        5.   Plaintiffs' Case Has Strengths but Further Litigation is Risky, Expensive, and Complex, Particularly Attaining and Maintaining Class Action Status Through Trial.............................................................................................................10

        6.   The Settlement Amount is Fair and Reasonable....................................13

    D.   The Recommended PAGA Resolution is Appropriate ...........................16

    E.   The Parties Propose an Appropriate *Cy Pres* Designee...........................17

    F.   The Court Approved Notice Plan Has Been Executed Satisfactorily and Due Process Has Been Satisfied ..........................................................................19

    G.   The Court Should Confirm Its Certification of the Settlement Class.................19

V.    CONCLUSION .................................................................................20

1

### *Table of Authorities*

2

**Cases**

3 *Benton v. Telecom Network Specialists, Inc.* 220 Cal.App.4th 701 (2013) ................................ 11

4 *Bussie v. Allmerica Fin. Corp.*, 50 F.Supp2d 59 (D. Mass. 1999) ................................................ 6

5 *Cho v. Seagate Technology Holdings, Inc.*, 177 Cal.App.4th 734 (2009) .................................... 6

6 *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004) ......................... 7, 19

7 *Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785 (2009) ............................................ 7

8 *Custom LED, LLC v. eBay, Inc.*, 2014 U.S. Dist. LEXIS 87180 (N.D. Cal. June 24, 2014) ........ 9

9 *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ................................................................. 18

10 *Dunk v. Ford Motor Company*, 48 Cal.App.4th 1794 (1996) ....................................................... 6

11 *Foster v. Advantage Sales & Mktg., LLC.*, No. 18-CV-07205-LB, 2019 WL 6699793 (N.D. Cal.

12     Dec. 9, 2019) ........................................................................................................................ 17

13 *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC, 2010 WL 1687832 (N.D.

14     Cal. Apr. 22, 2010) ................................................................................................................ 1

15 *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ......................................................... 19

16 *Home Depot U.S.A., Inc. v. Superior Court* 191 Cal.App.4th 210 (2010) ................................. 15

17 *In re Beef Industry Antitrust Litigation*, 607 F.2d 167 (5th Cir. 1979)...................................... 19

18 *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)................................. 7

19 *In Re Harnischfeger Indus., Inc.* 212 F.R.D. 400 (E.D.Wis. 2002)............................................. 6

20 *In re Microsoft I-V Cases*, 135 Cal.App.4th 706 (2006) ............................................................. 6

21 *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995)...................................................... 9

22 *In re Xoma Corp. Sec. Litig.*, U.S. Dist. LEXIS 10502 (N.D. Cal. July 10, 1992) ..................... 8

23 *Jones v. Agilysys, Inc.*, 2014 U.S. Dist. LEXIS 68562 (N.D. Cal. May 19, 2014)...................... 9

24 *Kilby v. CVS Pharmacy, Inc.* 63 Cal.4th 1 (2016) ..................................................................... 11

25 *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) .................................... 13

26 *Lowe v. Popcornopolis LLC*, No. CV196984PSGRAOX, 2020 WL 5991509 (C.D. Cal. July 8,

27     2020) ..................................................................................................................................... 17

28 *Lusby v. Gamestop, Inc.*, 2015 U.S. Dist. LEXIS 42637 (N.D. Cal. Mar. 31, 2015) .................. 6

---

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987) 19

*Mendez v. R+L Carriers, Inc.* 2012 U.S. Dist. LEXIS 165221 (N.D. Cal. Nov. 19, 2012) ........12

*Moore v. Fitness Int'l, LLC*, No. 3:12-CV-1551-LAB-NLS, 2014 WL 12571448 (S.D. Cal. Jan. 22, 2014) ........................................................................................................................17

*Officers for Justice v. Service Comm'n of City and County of San Francisco*, 688 F.2d 615 (9th Cir. 1982) .....................................................................................................................5, 13

*Pilkington v. Cardinal Health, Inc., (In re Syncor ERISA Litig.)*, 516 F.3d 1095 (9th Cir. 2008).. ..................................................................................................................................5

*Rodriguez v. West Pub'l Corp.*, 563 F.3d 948 (9th Cir. 2009) ...................................................13

*Roe v. Jose Torres L.D. Latin Club Bar, Inc.*, No. 19-CV-06088-LB, 2020 WL 5074392 (N.D. Cal. Aug. 27, 2020) ..........................................................................................................17

*Rosales v. El Rancho Farms,* 2015 U.S. Dist. LEXIS 95756 (E.D. Cal. July 21, 2015).............9

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ...................................................................5

*Trotsky v. Los Angeles Fed. Sav. & Loan Assoc.*, 48 Cal.App.3d 134 (1975)...........................19

*Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830 (E.D.La. 2007) ..........................................6

*Viceral v. Mistras Grp., Inc.*, 2016 WL5907869 (N.D. Cal. 2016). .........................................16

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) .......................................6

*Washington v. Joe's Crab Shack*, 271 F.R.D. 629 (N.D. Cal. 2010).........................................12

*Weinberber v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) .................................................................8

*Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224 (2001) ................................................19

*Wilson v. Tesla, Inc.*, No. 17-CV-03763-JSC, 2019 WL 2929988 (N.D. Cal. July 8, 2019) ........1

**Treatises**

Manual for Complex Litig. (4th ed. 2004).................................................................................6

## I.    INTRODUCTION

Plaintiffs Elias Yamido, Mark Sibayan, and Thelma Yamido ("Plaintiffs") respectfully request final approval of the instantly proposed $675,000 class action settlement[1], which was preliminarily approved by the Court on July 16, 2020, and involves the following "Settlement Class" members: all persons who, at any time between January 1, 2017, through July 16, 2020, worked for Defendant as an hourly/non-exempt worker at Defendant's Burlingame Facility, located at 810 Malcolm Road in Burlingame, California 94010.

The Court should have no hesitation granting final approval now because nothing has occurred since July 2020 to cast doubt on the Court's preliminary approval determination. On the contrary, the notice process has gone exceptionally well: (1) 975 out of 984 notice packets were successfully delivered; (2) no one has objected;[2] and (3) no one has requested exclusion from the settlement. Kline Dec.[3] ¶¶ 10, 14, and 15. Indeed, Settlement Class member reaction confirms that final approval is the next necessovary step here.

As ordered by the Court, the Settlement Class was sent notice of the proposed settlement on March 17, 2020. The notice process has been well managed by the Settlement

---

[1] The settlement and its terms are fully set forth in the Stipulation of Class Action Settlement and Release of Claims (hereinafter "Agreement" and cited as "AGMT") executed by Plaintiffs and Defendant Flying Food Group, LLC ("Defendant") (collectively referred to herein as the "Parties"). The Agreement is attached as Exhibit "A" to the Declaration of Arlo Uriarte ("Uriarte Dec.").

[2] Courts typically find settlement terms to be presumptively fair when there are no objections or very few objections. *E.g., Wilson v. Tesla, Inc.*, No. 17-CV-03763-JSC, 2019 WL 2929988, at *9 (N.D. Cal. July 8, 2019), motion for relief from judgment denied, *citing Garner v. State Farm Mut. Auto. Ins. Co*., No. CV 08 1365 CW EMC, 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) (Courts have repeatedly recognized that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of the proposed class settlement action are favorable to the class members…Thus, the Court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it) *See also, Stoetzner v. U.S. Steel Corp.*, 897 F. 2d 115, 118-119 (3d. Cir. 1990); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981).

[3] Lindsay Kline (a case manager for Simpluris, Inc.) has submitted a declaration that summarizes the settlement administration work performed thus far ("Kline Dec."); it is attached as Exhibit "B" to Uriarte Dec.

---

Administrator and is now complete. Actual and significant monetary compensation awaits everyone due to the lack of opt-outs. Kline Dec. ¶ 14. On average, each person is set to receive $422.03. Kline Dec. ¶ 13. The highest estimated settlement payment is $1,165.87 *Id.* Individual payments will vary *pro rata* based on employee length of service; a "checks-mailed" process is to be used meaning there is no requirement for Settlement Class members to send in claim forms in order to receive money. AGMT ¶¶ 9.31 and 9.32.

With the above in mind, Class Counsel[4] respectfully submits that the Settlement Class is best served by the proposed settlement rather than by further litigation and the ensuing substantial risks. Additionally, as evidenced by Class member reaction, the proposed settlement is fair, reasonable, and adequate.

## II.    PROCEDURAL POSTURE, INFORMATION EXCHANGE, AND MEDIATION

Plaintiffs filed a putative class action lawsuit with a PAGA claim in California Superior Court for the County of San Mateo on December 14, 2018. The matter was removed to this Court by Defendant on January 18, 2019, pursuant to the Class Action Fairness Act.

Originally, Plaintiffs' claims included an unpaid wages cause of action due to what they perceived as negative rounding by Defendant. Plaintiffs ceded this cause of action (as thoroughly discussed in their opposition to Defendant's motion to transfer venue [Dkt. No. 21]) to a related case in Los Angeles County, which was filed just before the instant action in November of 2018 (*Rodas v. Flying Food Group, LLC, et al., Super. Ct.*, Case No. STCV-06795). Therefore, the remaining claims at hand are: (1) unpaid meal period premiums; (2) unpaid rest period premiums; (3) a failure to provide sick days; (4) a failure to provide seats; (5) wage statement violations; (6) waiting time penalties; (7) unfair competition in violation of Cal. Bus. and Prof. Code §§ 17200 et seq.; and (8) violations of the Private Attorney General's Act, Cal. Lab. Code ¶¶ 2699 et seq., derivative of the other core violations identified in the complaint.

Defendant filed a motion to Change Venue to the Central District on July 26, 2019, but it was denied on September 5, 2019. Shortly after this, in or round the beginning of October 2019,

---

[4] "Class Counsel" refers to Arlo Garcia Uriarte of Liberation Law Group, P.C., as appointed by the Court in its order granting preliminary approval.

the Parties agreed that mediation was a desirable alternate dispute resolution option. Uriarte Dec. ¶ 3. They selected Michael Dickstein as the mediator who has significant experience mediating class action and representative group action cases in the San Francisco Bay Area. *Id.*

Plaintiffs only agreed to mediate if certain, essential items were produced before the session so that they could mediate from a position of knowledge and preparedness. Uriarte Dec. ¶¶ 4-6. By this point, Defendant had already answered Plaintiffs' initial written discovery requests, which consisted of document requests, special interrogatories, and a notice to depose a Person Most Knowledgeable; Plaintiffs also responded to Defendant's written discovery requests. Uriarte Dec. ¶ 7.

Therefore, before mediation, Plaintiffs received the following items from Defendant through either formal discovery or through a pre-mediation information exchange: (1) all company policy documents related to Plaintiffs' remaining claims; (2) a twenty percent timekeeping and payroll sample to track Defendant's meal period compliance; (3) a full list of meal and rest period compensation payments made by Defendant to putative class members; (4) the names, addresses, and phone numbers of approximately 200 putative class members; and (5) a listing of relevant work positions, number of putative class members in those positions, and typical daily shift lengths worked by putative class members.[5] Uriarte Dec. ¶¶ 4-6. Also, on November 4, 2019, Plaintiffs deposed Defendant's Person Most Knowledgeable, Murielle Bedard, regarding the wage and hour practices and policies connected to their claims. Uriarte Dec. ¶ 6.

Defendant also shared the following data points prior to mediation in or around September of 2019: (1) there are 956 total putative class members; (2) 56,644 total workweeks; (3) 438 separated putative class members (no longer working for Defendant); (4) the average pay rate for the putative class is $18.68; and (5) putative class members did not execute any meal

---

[5] This positional information and the corresponding number of workers in each position was pivotal for the evaluation of Plaintiffs' seating claim under IWC Wage Order 5-2001 § 14(A) ("All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats."). This claim was specific to only certain positions; Plaintiffs were able to speak to some of those specific employees and use the number of employees in each position to evaluate the projected monetary value of Plaintiffs' seating claim.

1    period waivers for shifts between five and six hours long. Uriarte Dec. ¶ 5. This information was

2    critical for Plaintiffs' damages model which was presented at mediation. The mediation was

3    successful, and the Parties executed a Memorandum of Understanding in January 2020 detailing

4    the key elements of the deal. Uriarte Dec. ¶ 7.

5         This proposed settlement received the Court's preliminary approval on July 16, 2020

6    [Dkt. No. 39]. Plaintiffs filed their motion for Attorney's Fees, Costs, and Plaintiffs'

7    Enhancement on September 15, 2020, within the Court's assigned deadline [Dkt. No. 40]. Now,

8    Plaintiffs move for final approval of this settlement and ask the Court to order the funding of the

9    gross settlement and its full distribution as outlined in the Agreement and as detailed below.

10               **III.    OVERVIEW OF THE SETTLEMENT AGREEMENT**

11        The Agreement entails a $675,000 non-reversionary gross settlement fund from which

12   the following agreed upon deductions have been requested: (1) $202,500 in attorney's fees for

13   Class Counsel or thirty-percent of the common fund; (2) $13,055.29 in accrued litigation costs

14   for Class Counsel; (3) $6,250 in administration costs for the Settlement Administrator; and (4)

15   enhancement awards for Plaintiffs in the amount of $5,000 each ($15,000 total). AGMT ¶¶ 6.1,

16   6.2, 7.1, Plaintiffs now seek final approval of the proposed $30,000 PAGA allocation, which

17   must be distributed as follows pursuant to Labor Code § 2699(l)(2): $22,500 to the California

18   Labor & Workforce Development Agency ("LWDA") and an additional $7,500 to be added to

19   the "Net Settlement Fund" and distributed to the Settlement Class. AGMT ¶ 7.2.

20        The Net Settlement Fund is to be distributed *pro rata* to all Settlement Class members

21   because there are no requests for exclusions; claims will not be required. Kline Dec. ¶ 14;

22   AGMT ¶¶ 9.31 and 9.32. The Parties agreed (and as preliminarily approved by the Court) that

23   there should be two rounds of checks mailed if necessary. *Id.* The first round will entail checks

24   mailed to all participating Settlement Class members. The second round only occurs if there are

25   unnegotiated checks (60-day check-cashing period) amounting to more than $15,000 total. *Id.* In

26   this case, the unnegotiated funds would be redistributed proportionally to Class Members who

27   did negotiate their checks. *Id.* If the unnegotiated amount is less than $15,000, it would be

28   awarded to the Court approved *cy pres* designee. *Id.*

Plaintiffs propose Instituto Laboral de la Raza[6] ("ILR") as a worthy *cy pres* beneficiary. Plaintiffs' counsel has recommended ILR as a *cy pres* beneficiary many times before in similar cases, and they are almost always approved (including by this Court). Uriarte Dec. ¶ 9. Plaintiffs' counsel nor his firm receive any money from the organization nor are they involved in its operations in any way. *Id.* ILR does sometimes refer clients to Plaintiffs' counsel's firm, but ILR is not paid any referral fees. *Id.*

## IV.     FINAL SETTLEMENT APPROVAL SHOULD BE GRANTED

### A.  Class Action Settlements Are Generally Favored

The Ninth Circuit has communicated a strong judicial policy favoring settlements, especially for complex litigation like the instant class action. *See, e.g. Pilkington v. Cardinal Health, Inc., (In re Syncor ERISA Litig.)*, 516 F.3d 1095, 1101 (9th Cir. 2008) *quoting Officers for Justice v. Service Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) ("it must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation…").

### B.  Class Action Settlements Should Be Fair, Reasonable, and Adequate

Federal Rule of Civil Procedure ("FRCP") 23(e)(2) requires class action settlements to undergo court approval to ensure that they are fair, reasonable, and adequate. The decision to approve or reject a settlement is within the sound discretion of the trial judge. *Staton v. Boeing Co.*, 327 F.3d 938, 986 (9th Cir. 2003).

Judicial review of a class action settlement is comprised of a two-step process: (1) a court conducts a preliminary fairness evaluation to determine whether the putative class meets certification requirements for settlement purposes and to determine whether the proposed settlement is within the range of possible approval, which has been granted in this case; and (2) after class members have had an opportunity to object or opt-out, the court must make a final

---

[6] "For over 30 years, the [ILR] has served low income families of California as a nonprofit advocacy and workers' resource center. Headquartered in the Mission District of San Francisco, the Instituto provides legal services, peer counseling, financial education and access to a network of services to the unorganized working poor." *See*, https://www.ilaboral.org/aboutus.html

1  fairness determination. *Lusby v. Gamestop, Inc.*, 297 F.R.D. 400, 412 (N.D. Cal. 2013) relying

2  on the Manual for Complex Litig. § 21.632 (4th ed. 2004).

3        While trial courts have "broad discretion" to determine whether class action settlements

4  are fair, the inquiry "must be limited to the extent necessary to reach a reasoned judgment that

5  the agreement is not the product of fraud or overreaching by, or collusion between, the

6  negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to

7  all concerned." *Cho v. Seagate Technology Holdings, Inc.*, 177 Cal. App. 4th 734, 742-743

8  (2009) quoting *Officers for Justice*, 688 F.2d at 624. *See also, Dunk v. Ford Motor Company*,

9  48 Cal. App. 4th 1794, 1801 (1996) (whether a proposed settlement is "fair, adequate, and

10  reasonable" is the paramount concern).

11        Due regard should be given to what is otherwise a private consensual agreement.[7] *In re*

12  *Microsoft I-V Cases*, 135 Cal.App.4th 706, 723 (2006). Because all together, "the [trial] court's

13  determination is nothing more than 'an amalgam of delicate balancing, gross approximations

14  and rough justice.'" *Dunk, supra* at 1801, *quoting Officers for Justice*, 688 F.2d at 624. *See also,*

15  *Wershba v. Apple Computer,* 91 Cal. App. 4th 224, 246 (2001) ("The proposed settlement is not

16  to be judged against a hypothetical or speculative measure of what might have been achieved

17  had plaintiffs prevailed at trial.")

18        **C.  All Relevant Factors Weigh in Favor of Final Approval**

19        Now that the proposed settlement has been preliminarily approved and the notice

20  process has been successfully completed, the Court should grant final approval because the

21  settlement is indeed fair, reasonable, and adequate as required by applicable law. *Cho*, *supra* at

22  742-743. A presumption of fairness exists where: (1) the settlement is reached through arm's

23  length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court

24

25  _____

26  [7]  The proponents of a class settlement can obtain a strong initial presumption that the
   compromise is fair and reasonable by establishing that the settlement was reached after arms-
   like negotiations by competent counsel. *E.g., Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d

27  96, 116 (2d Cir. 2005); *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 844 (E.D.La.
   2007); *In Re Harnischfeger Indus., Inc.* 212 F.R.D. 400, 410 (E.D.Wis. 2002); *Bussie v.*

28  *Allmerica Fin. Corp.*, 50 F.Supp2d 59, 77 (D. Mass. 1999).

1  to act intelligently; (3) counsel are experienced in similar litigation; and (4) the percentage of

2  objectors is small. *Dunk, supra* at 1802.

3      For additional guidance, courts typically consider some or all the following factors when

4  deciding final approval: "(1) the strength of the plaintiff's case; (2) the risk, expense,

5  complexity, and likely duration of further litigation; (3) the risk of maintaining class action

6  status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

7  completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the

8  presence of a governmental participant; and (8) the reaction of the class members of the

9  proposed settlement." *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir.

10 2004); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("The

11 factors in a court's fairness assessment will naturally vary from case to case.")

12      1.  <u>The Parties Reached the Proposed Settlement After Arm's Length</u>

13          <u>Negotiations</u>

14      The Agreement was reached at arms-length and executed in good faith by the Parties.

15 The Parties came to terms after a full day's mediation with Michael Dickstein, a respected

16 mediator with experience mediating class and collective action cases in the San Francisco Bay

17 Area. Uriarte Dec. ¶ 8. Both sides prepared detailed mediation briefs and evaluated Defendant's

18 potential liability on a class-wide basis. *Id.* The key terms of the settlement were reached only

19 through Mr. Dickstein's guidance; the Parties did not meet separately to craft a deal. *Id.* Only

20 after the major elements of a proposed settlement were agreed to, counsel for both sides

21 carefully crafted, negotiated, and finalized the Agreement. *Id.*

22      Moreover, Class Counsel submits that given the constraints and realities of the case, the

23 Parties have been able to construct a settlement that is fair, reasonable, adequate, and in the best

24 interests of the class. *See, Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785, 786

25 (2009) ("A court should give considerable weight to the competency and integrity of counsel

26 and the involvement of a neutral mediator in assuring itself that a class action settlement

27 agreement represents an arm's-length transaction entered without self-dealing or other potential

28 misconduct."). *See also, In re Xoma Corp. Sec. Litig.*, U.S. Dist. LEXIS 10502, at *9 (N.D. Cal.

1   July 10, 1992), citing *Weinberber v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ("The court is

2   entitled to rely heavily on the assessment of able counsel negotiating at arms' length…When a

3   settlement is achieved through arms-length negotiations between experienced counsel, the court

4   should be hesitant to substitute its own judgment for that of counsel absent a showing of fraud,

5   collusion or other forms of bad faith.").

6           2.   <u>Substantial Investigation Supports Plaintiffs' Recommendation of the</u>

7           <u>Settlement</u>

8           Substantial discovery and information exchange occurred before Plaintiffs participated in

9   the January 2020 mediation, which led to the proposed settlement. The Parties exchanged written

10  discovery requests, including requests for production of documents and special interrogatories.

11  Uriarte Dec. ¶¶ 4-6. On November 4, 2019, Plaintiffs deposed Defendant's Person Most

12  Knowledgeable, Murielle Bedard, regarding the wage and hour practices and policies relevant to

13  their claims. Uriarte Dec. ¶ 6.

14          Then, Plaintiffs insisted on the following information before mediation, which

15  Defendant provided: (1) all company policy documents related to Plaintiffs' remaining claims;

16  (2) a twenty percent timekeeping and payroll sample to track Defendant's meal period

17  compliance; (3) a full list of meal and rest period compensation payments made by Defendant to

18  putative class members; (4) the names, addresses, and phone numbers of approximately 200

19  putative class members; and (5) a listing of relevant work positions, number of putative class

20  members in those positions, and typical daily shift lengths worked by putative class members.

21  Uriarte Dec. ¶ 4.

22          Defendant also shared the following data points prior to mediation in or around

23  September of 2019: (1) there are 956 total putative class members; (2) 56,644 total workweeks;

24  (3) 438 separated putative class members (no longer working for Defendant); (4) the average

25  pay rate for the putative class is $18.68; and (5) putative class members did not execute any

26  meal period waivers for shifts between five and six hours long. Uriarte Dec. ¶ 5.

27          Considering the foregoing, the Parties mediated and agreed on this settlement from a

28  position of substantial knowledge. Plaintiffs were armed with enough information to understand

---

1  the full breadth of their putative class claims; their decision to settle was properly informed, and

2  their recommendation of the instant settlement is sound.

3            3.  <u>Class Counsel is Experienced and Endorses the Settlement</u>

4      Generally, courts should rely upon the judgment of experienced counsel when assessing

5  the adequacy of proposed class action settlements. *E.g. Rodriguez v. W. Publ'g Corp.*, 563 F.3d

6  948, 965 (9th Cir. 2009) (courts have long deferred to the judgment of counsel when approving

7  class settlements so long as they are experienced and well-informed); *In re Pacific Enters. Sec.*

8  *Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better

9  positioned than courts to produce a settlement that fairly reflects each party's expected outcome

10 in litigation.").

11     Class Counsel has substantial class action experience, specifically regarding actions

12 involving the application of California's wage and hour laws. Uriarte Dec. ¶¶ 17-25. Counsel

13 and his law firm have litigated several class actions against airport employers representing

14 airport employees. Uriarte Dec. ¶¶ 21-22. Counsel's experience renders him qualified to

15 evaluate the class claims and defenses at hand. Counsel is confident that the proposed

16 settlement meets all applicable requirements of California law, and given the unique

17 circumstances present, it is in the best interests of the Class. Uriarte Dec. ¶¶ 11, 16.

18            4.  <u>Class Member Reaction Has Been Very Positive</u>

19     The Settlement Class' reaction clearly supports final approval. <u>No one</u> has objected, and

20 <u>no one</u> has requested exclusion from the proposed settlement. Kline Dec. ¶¶ 14-15. Numerous

21 courts have found settlement terms to be presumably fair when there is a low percentage of

22 objectors. *E.g. Custom LED, LLC v. eBay, Inc.*, 2014 U.S. Dist. LEXIS 87180, *16 (N.D. Cal.

23 June 24, 2014); *Jones v. Agilysys, Inc.*, 2014 U.S. Dist. LEXIS 68562, *6-7 (N.D. Cal. May 19,

24 2014); *Rosales v. El Rancho Farms,* 2015 U.S. Dist. LEXIS 95756, *43 (E.D. Cal. July 21,

25 2015) (absence of objections raises a strong presumption that the terms of a proposed settlement

26 are favorable to the class members).

27     The Court also finds information regarding the delivery of notice packets relevant. *See,*

28 <u>The Northern District's Procedural Guidance for Class Action Settlements</u>, Sec. Final Approval

---

¶ 1 (November 1, 2018). After the Settlement Administrator's efforts to initially update addresses and re-mail undeliverable mailings, only nine notice packets remain undeliverable. Kline Dec. ¶ 10. This means that 975 out of 984 notice packets were delivered, a 99.09% success rate. *Id.* Considering this and the fact that zero objections or opt-out requests were received, Plaintiffs submit that the notice process was extremely successful.

> 5. <u>Plaintiffs' Case Has Strengths but Further Litigation is Risky, Expensive, and Complex, Particularly Attaining and Maintaining Class Action Status Through Trial</u>

Plaintiffs detailed their perception of the strengths and weaknesses of their class allegations when moving for preliminary approval. Nothing has occurred since then to alter their position. Plaintiffs focused on their core claims of meal period, rest period, and seating violations[8] after ceding their unpaid wages (rounding) claim to the *Rodas* action (as described above in Section II of this memorandum).

In general, Plaintiffs believe their claims are strong from a class certification perspective because in their view Defendant operated using central guidelines and protocols that were wholly applicable to all or nearly all Settlement Class members. These include written meal and rest period policies, on the ground practices regarding the application of these written policies, and policies or practices related to the payment or non-payment of meal period compensation and rest period compensation. Plaintiffs submit that they could propose subclasses based on the different position/job classifications to highlight the common reasons why breaks were not provided and why break premiums were often not paid.

Plaintiffs' principal class theories related to their core claims are: (1) barriers like understaffing and overwork which led to Defendant's inability to provide all required breaks; (2)

---

[8] Although Plaintiffs experienced some sick day issues, Plaintiffs' counsel was unable to confirm this as a pervasive, common problem among Settlement Class Members. Therefore, the decision was made to focus on meal periods, rest periods, and seating for mediation – by far the highest value and important claims in counsel's view.

Defendant did not have a fully compliant break penalty pay policy or practice (only partial meal period premiums were issued and no rest period premiums were issued); and (3) Defendant should have provided seats to certain employees based on the work environment (i.e. the type of duties discharged and where they were discharged). Plaintiffs' theories have certain fundamental strengths and weaknesses. The strengths include:

- As mentioned above, in Plaintiffs' experience, and as echoed by many of their co-workers, Defendant's meal and rest period issues mainly arise because of heavy workloads combined with understaffing; these issues do not allow putative class members to receive coverage so that they can consistently go on breaks. From a class certification perspective, "[a]n employer may not undermine a formal policy of providing meal [or rest breaks] breaks by pressuring employees to perform their duties in ways that omit breaks." *Brinker Rest. Corp. v. Superior Court* (2012) 53 Cal. 4th 1004, 1021-1022, *citing Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal. App. 4th 949, 962-63. *See also, e.g. Dilts v. Penske Logistics, LLC* (S.D. Cal. 2010) 267 F.R.D. 625, 638 (court certified a break class based on common proof of structural barriers to wage and hour compliance instead of proof of a single, written policy).

- Plaintiffs also allege that Defendant lacked an adequate meal period compensation policy for much of the Class Period and never had a rest period compensation policy during the Class Period. A lack of break penalty pay policy when breaks are sometimes not provided supports class certification in and of itself. *See*, *Benton v. Telecom Network Specialists, Inc.* 220 Cal.App.4th 701, 724 (2013) (acknowledging that an unlawful lack of policy may provide sufficient support for meal and rest period class certification).

- Plaintiffs maintain that certain Class members work in positions that legally require seats. For example, Plaintiff Thelma Yamido who worked for Defendant as a station attendant or food preparer, alleges that her position requires a seat under relevant law. IWC Wage Order 5-2001 § 14(A) ("All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats."). Plaintiffs submit that a weighing of the "totally of the circumstances," as required by *Kilby v. CVS Pharmacy, Inc.* (2016), would show that Defendant failed to provide seats. *Kilby v. CVS Pharmacy, Inc.* 63 Cal.4th 1, 19–20 (2016). And, "[a]n employer seeking to be excused from the requirement **bears the burden of showing compliance is infeasible** because no suitable seating exists." *Id.* at 24 (emphasis added).

Despite these strengths, Plaintiffs recognize several weaknesses. These listed below are important points that underscore, among other things, the common difficulties regarding the certification of meal and rest period classes:

- Defendant could argue that Class members may have experienced *isolated* meal and rest break issues due to deviations from their lawful written policies, but there is no "predominance" for class certification purposes. Meal and rest period claims are more difficult to certify when plaintiffs rely on allegedly unlawful practices or unwritten policy. *See, e.g. Washington v. Joe's Crab Shack* 271 F.R.D. 629, 640 (N.D. Cal. 2010) (finding individual issues predominated when plaintiff contended that defendant followed a common unwritten policy of denying meal and rest breaks); *Mendez v. R+L Carriers, Inc.* 2012 U.S. Dist. LEXIS 165221, at *44 (N.D. Cal. Nov. 19, 2012) ("when a plaintiff's claims are based on allegations of an unwritten practice, as opposed to a written policy, the putative class members will often have to prove individual elements in order to show the defendant's liability) (internal quotations omitted).

- Meal and rest period classes are generally difficult to certify because of *Brinker's* "provide" standard ("an employer must relieve the employee of all duty for the designated period but need not ensure that the employee does no work.") *Brinker Restaurant Corp. v. Superior Court,* 53 Cal. 4th 1004, 1034-1035 (2012). Relying on this, Defendant could argue that its employees are regularly provided breaks, but individual issues sometimes occur that disturb a common policy or practice. This potential difficulty is of particular concern when dealing with large putative classes, as here, that contain hundreds of members with experiences that naturally vary to some degree.

- Defendant did have a meal period compensation policy for at least part of the Class Period. The representative sample provided shows that Defendant paid $95,275.41 in meal period compensation to Class members. This fact weakens Plaintiffs' potential "no break penalty pay" policy class certification argument. Uriarte Dec. ¶ 12.

- Defendant settled a similar, prior case for which Plaintiffs' counsel has reviewed the Final Approval order and Settlement Agreement – *Pineda v. Flying Food Group, LLC*, case no. BC508478. The *Pineda* case is a similar wage and hour case against Defendant, especially as it pertains to Plaintiffs' meal and rest period claims, and Defendant has a release that applies to many putative class members through the end of 2016. This significantly reduces the Class Period and size contemplated by Plaintiffs in their complaint. *Id.*

Undoubtedly, if it were not for this proposed settlement, any further litigation would yield an uncertain result. Class actions are generally complex cases, and this lawsuit presents its

1    own set of potential difficulties. Plaintiffs' counsel believes the risks associated with further

2    litigation are substantial. Uriarte Dec. ¶ 11.

3        For example, the following are just some of the risks considered: (1) continued

4    discovery on class certification issues could reveal defects in Plaintiffs' class theories; (2) the

5    Court could refuse certification as to some or all of Plaintiffs' claims; (3) in the Court's eventual

6    estimation, Plaintiffs may not formulate a convincing trial plan that effectively deals with any

7    individual issues; (4) if Plaintiffs attain certification in whole or in part, Defendant may attain

8    decertification after post-certification discovery; (5) Plaintiffs may lose at trial, and even if they

9    can win, Defendant may successfully appeal any judgment attained; and (6) further progression

10   of this case would only lead to increased expenses and hours worked by Plaintiffs' counsel that

11   would reduce future putative class member recoveries and not necessarily lead to increased

12   gains. *Id.*

13                    6.    The Settlement Amount is Fair and Reasonable

14       Courts typically analyze the reasonableness of a settlement amount in view of the

15   following: "it is the very uncertainty of outcome in litigation and avoidance of wasteful and

16   expensive litigation that induce consensual settlements. [A] proposed settlement is thus not to be

17   judged against a hypothetical or speculative measure of what *might* have been achieved…rather

18   the very essence of a settlement is…a yielding of absolutes and an abandoning of highest hopes.

19   The fact that a proposed settlement may only amount to a fraction of the potential recovery does

20   not, in and of itself, mean that the proposed settlement is grossly inadequate and should be

21   disapproved." *Officers for Justice*, 688 F.2d at 625; *Linney v. Cellular Alaska Partnership* 151

22   F.3d 1234, 1242 (9th Cir. 1998).

23       Counsel for Plaintiffs believes the proposed settlement is in the best interests of Plaintiffs

24   and the Settlement Class considering the realities at hand. Uriarte Dec. ¶¶ 11, 16. *See*, *Rodriguez*

25   *v. West Pub'l Corp.* 563 F.3d 948, 965 (9th Cir. 2009) (courts have long deferred to the judgment

26   of counsel when approving class settlements so long as they are experienced and well-informed).

27       The proposed settlement is an acceptable proportion of Plaintiffs' best-case scenario

28   recovery, which is of course far from guaranteed. Plaintiffs' counsel performed a detailed

1  damages analysis prior to mediation in order to be well-informed during settlement negotiations.

2  Uriarte Dec. ¶ 10.

3      Plaintiffs' counsel began assessing potential damages after lengthy meetings with

4  Plaintiffs and numerous interviews with putative class members. *Id.* Plaintiffs' counsel attempted

5  to contact over two hundred putative class members and interviewed over fifty of them; some of

6  those interviewed provided declarations in support of Plaintiffs, which were very valuable at

7  mediation. Uriarte Dec. ¶ 13.

8      Then, Defendant's representative timekeeping and payroll sample was analyzed. Uriarte

9  Dec. ¶ 10. Plaintiffs' counsel analyzed the sample provided by Defendant in-house, with the help

10  of the firm's data analyst. *Id.* He made the following findings as to meal period compliance.

11  Plaintiffs analyzed 44,194 shifts and discovered 31,033 potential meal period violations; this

12  includes 5,287 late meal periods, 24,402 short meal periods, 4,684 shifts where a 1st meal period

13  should have been recorded but was not; and 11,799 shifts where a 2nd meal period should have

14  been recorded but was not. *Id.*

15      Plaintiffs also relied on the data points provided by Defendant for the damages model: (1)

16  there are 956 total putative class members; (2) 56,644 total workweeks; (3) 438 separated

17  putative class members (no longer working for Defendant); (4) the average pay rate for the

18  putative class is $18.68; and (5) putative class members did not execute any meal period waivers

19  for shifts between five and six hours long. Uriarte Dec. ¶ 5.

20      Using the information attained from Plaintiffs, putative class member interviews,

21  Plaintiffs' analysis of the timekeeping and payroll sample, and the data points provided by

22  Defendant, Plaintiffs assigned meal and rest period failure rates to each workweek in the Class

23  Period. Uriarte Dec. ¶ 14.

24      Plaintiffs believe a 2 per workweek meal period failure rate is reasonable considering the

25  potential testimony of Plaintiffs, putative class member interviews/declarations, and as

26

27

28

confirmed by the analysis[9] performed on the representative timekeeping and payroll sample provided by Defendant. *Id.* This equals $2,116,219.84 for the entire Class Period.

Plaintiffs relied only on their own experiences and putative class member interviews/declarations to determine a weekly rest period failure rate because Defendant is not required to and did not record employee rest periods. Plaintiffs assigned a 1 per workweek rest period failure rate based on the foregoing which equals $1,058,109.92. *Id.*

Lastly, a failure to provide seating is subject to two kinds of penalties. First, the IWC states: "…in addition to any other civil penalties provided by law, any employer…who violates…the provisions of this order, shall be subject to the civil penalty of: (1) Initial Violation -- $50.00 [per employee for each pay period]; and (2) Subsequent Violations -- $100.00 [per employee for each pay period]. IWC Wage Order 5-2001 § 20(A). Also, failure to provide seating is a violation of Labor Code § 1198, which means a "default remedy" of one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation (source of default remedy is Labor Code § 2699, subdivision (f)) [PAGA]. *Home Depot U.S.A., Inc. v. Superior Court* (2010) 191 Cal.App.4th 210, 225–226, as modified on denial of reh'g (Jan. 10, 2011).

Based on the foregoing, Plaintiffs can recover up to $150 for each initial seating violation (per employee per pay period) and up to $300 for each subsequent violation (per employee per pay period). If litigation were to continue, Plaintiffs would conduct site inspections and hire an expert on seating violations to continue to build their seating claim. Uriarte Dec. ¶ 15.

Plaintiffs estimate that fifteen percent of the putative class should have been provided a seat. *Id.* That is approximately 143 putative class members. There are approximately 161 total weeks or 80 pay periods in the Claim Period. 143 multiplied by $150 for the initial violation

---

[9] Plaintiffs' sample analysis revealed up to $475,221.44 in owed meal period premiums. Extrapolating this to the entire class and Claim Period you arrive at $2,376,107.20, which is consistent with a 2 per week meal period violation rate. Uriarte Dec. ¶ 10.

1  equals $21,450; 143 multiplied by $300 and then multiplied by 79 pay periods for subsequent

2  violations equals $3,389,100. Plaintiffs recognize that half of this is for PAGA penalties and that

3  those can be reduced per the Court's discretion. *See, e.g., Viceral v. Mistras Group, Inc.* (N.D.

4  Cal., Oct. 11, 2016, No. 15-Cv-02198-EMC) 2016 WL 5907869, at *8-9.)

5      Adding up the foregoing, Plaintiffs assigned a total best-case scenario value of

6  $6,563,429.76 to their core claims of unpaid meal premiums, unpaid rest premiums, and seating

7  violations. Therefore, the $675,000 proposed settlement represents a 10.3% recovery when

8  compared to this best-case scenario value. This is a favorable result, especially considering that

9  this case is pre-certification.

10      Plaintiffs submit that it would be more realistic to assign a probability of recovery to that

11  best-case scenario value. A 20% chance of success is reasonable in their view considering the

12  challenges posed by attaining class certification, maintaining it after post-certification

13  discovery, creating and succeeding on a manageable trial plan, defending any trial victory

14  against potential appeals, and the fact that the Court has discretion to severely reduce PAGA

15  penalties. This would adjust the recovery percentage up to 51.4%. The settlement represents a

16  very favorable result when viewed in this way.

17      **D. The Recommended PAGA Resolution is Appropriate**

18      Plaintiff submits that the proposed $30,000 PAGA allocation is appropriate and

19  sufficient because the settlement overall, not just the allocation, helps to achieve PAGA's chief

20  objective – to advance the state's policy of vigorously enforcing minimum labor standards. Cal.

21  Lab. Code § 90.5.

22      PAGA does not impose specific requirements for a monetary allocation. Instead, trial

23  courts have the power to review and approve a proposed PAGA allocation that is part of a class

24  action settlement. Cal. Lab. Code § 2699(l). Indeed, trial courts are afforded broad discretion for

25  purposes of determining the appropriate penalty amount and granting Court approval to PAGA

26  settlements. *See, Viceral v. Mistras Grp., Inc.*, 2016 WL5907869, at *8-9 (N.D. Cal. 2016).

27      Often, courts approve PAGA settlements that are a small fraction of the potential verdict

28  value of a PAGA claim while also being a small fraction of the total settlement amount. For

example, *Viceral v. Mistras Grp., Inc.* was about a $6,000,000 settlement and the court approved just a $20,000 PAGA allocation. What's more, a California state appellate court held that a "trial court did not abuse its discretion in approving a settlement which does not allocate any damages to the PAGA claims." *Nordstrom Corn. Cases*, 186 Cal. App. 4th 576, 579 (2010).

The proposed monetary allocation or less (relative to the settlement total) has been commonly approved in numerous previous cases. *See e.g., Roe v. Jose Torres L.D. Latin Club Bar, Inc.*, No. 19-CV-06088-LB, 2020 WL 5074392, at *2–3 (N.D. Cal. Aug. 27, 2020) ($2,000 PAGA allocation was approved in connection with a $135,000 class settlement by this Court); *Lowe v. Popcornopolis LLC*, No. CV196984PSGRAOX, 2020 WL 5991509, at *9 (C.D. Cal. July 8, 2020) (the court found a $20,000 PAGA allocation in connection with a $500,000 class settlement reasonable); *Foster v. Advantage Sales & Mktg., LLC.*, No. 18-CV-07205-LB, 2019 WL 6699793, at *6 (N.D. Cal. Dec. 9, 2019) (this Court preliminarily approved a $10,000 PAGA allocation in connection with a $1,200,000 settlement); *Moore v. Fitness Int'l, LLC*, No. 3:12-CV-1551-LAB-NLS, 2014 WL 12571448, at *5 (S.D. Cal. Jan. 22, 2014) ($2,500 PAGA allocation was approved in connection with a $200,000 class settlement); *Franco v. Ruiz Food Prods.*, 2012 U.S. Dist. LEXIS 169057, *41-42 (E.D. Cal. 2012) (approving a $2.5 million settlement with only a $10,000 PAGA allocation); *Chu v. Wells Fargo Investments*, LLC, 2011 U.S. Dist. LEXIS 15821, 2011 WL 672645 at *1 (N.D. Cal. 2011) (approving an allocation of $10,000 to settle PAGA claims out of a $6.9 million common-fund settlement). Accordingly, the Court should have no hesitation approving the proposed PAGA allocation.

### E.  The Parties Propose an Appropriate *Cy Pres* Designee

The Parties submit that Instituto Laboral de La Raza (hereinafter "ILR"), a nonprofit advocacy and workers' resource center in San Francisco, CA, is an appropriate and worthy *cy pres*. Courts "frequently apply [the *cy pres* doctrine] in the settlement of class actions… (citations omitted). Used in lieu of direct distribution of damages to silent class members, this alternative allows for aggregate calculation of damages, the use of summary claim procedures, and distribution of unclaimed funds to indirectly benefit the entire class (citations omitted). To ensure that the settlement retains some connection to the plaintiff class and the underlying

claims, however, a *cy pres* award must qualify as 'the next best distribution' to giving the funds directly to class members (citations omitted)." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012). More specifically, the Ninth Circuit requires "that there be a driving nexus between the plaintiff class and the *cy pres* beneficiar[y] (citations omitted). A *cy pres* award must be guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members and must not benefit a group too remote from the plaintiff class (citations omitted)." *Id.*

Plaintiffs submit that ILR fulfills these requirements. As a primary matter, it should be highlighted that the proposed *cy pres* will only receive settlement funds if some settlement checks are not negotiated by the Class and if that amount is less than $15,000 total; if it is more than $15,000 total, then a second distribution will be triggered for those Class members who did negotiate their checks. AGMT ¶¶ 9.31 and 9.32. This helps get more money to Class members as opposed to a potential large windfall for the *cy pres*, the latter not being appropriate here in Plaintiffs' view.

Moving to the standard identified in *Dennis*, there is a driving nexus between the Class at hand and ILR because the Class is a group of low-wage, hourly workers who were allegedly deprived of their wage and hour rights by Defendant. ILR helps workers just like these fight for justice, specifically the kind of recompense that the Class is set to receive here.

"For over 30 years, the Instituto Laboral de la Raza has served low income families of California as a nonprofit advocacy and workers' resource center. Headquartered in the Mission District of San Francisco, the Instituto provides legal services, peer counseling, financial education and access to a network of services to the unorganized working poor." *See*, https://www.ilaboral.org/aboutus.html. Clearly, the objectives of ILR are closely related to the objectives of the Labor statutes Defendant allegedly violated. Any silent Class members will share a close relationship between the types of workers ILR seeks to benefit. So, there is no risk here of benefitting a group "too remote from the plaintiff class." *Id.*

---

### F. The Court Approved Notice Plan Has Been Executed Satisfactorily and Due Process Has Been Satisfied

Class notice procedures "must fairly apprise the class members of the terms of compromise and the options open to dissenting class members." *Trotsky v. Los Angeles Fed. Sav. & Loan Assoc.*, 48 Cal. App. 3d 134, 151-52 (1975). Class notice should strike a balance between thoroughness and the need to avoid unduly complicating its content. *Wershba*, *supra* 91 Cal. App. 4th at 252. Generally, "notice is satisfactory if it…describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Village, LLC v. General Electric* 361 F.3d 566, 575 (9th Cir. 2004) (internal quotations omitted).

Here, the Court-approved notice procedure has met all the aforementioned requirements. As previously determined by the Court, the relevant Notice form contained all required information. Moreover, the Class had enough time to decide whether to opt-out or object to the settlement. Therefore, the Court-ordered notice procedures have been properly executed and due process has been satisfied.

### G. The Court Should Confirm Its Certification of the Settlement Class

Parties to a class action suit may negotiate a proposed settlement prior to obtaining class certification. *Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224, 240 (2001) ("precertification settlements are…routinely approved if found to be fair and reasonable") *citing Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998); *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987); *In re Beef Industry Antitrust Litigation*, 607 F.2d 167 (5th Cir. 1979).

For the instant action, the Court ordered the Settlement Class provisionally certified in its preliminary approval order on July 16, 2020. No subsequent event has occurred that may cause the Court to second guess its determination. In fact, the notice process was completed satisfactorily, and class member reaction has been very positive. As such, Plaintiffs request that the Court confirm its grant of class certification for settlement purposes only.

# V.    CONCLUSION

For all reasons stated herein, Plaintiffs respectfully request that the Court grant final approval of the proposed settlement.

Respectfully Submitted,

Dated: October 29, 2020

_____
Arlo Garcia Uriarte
Liberation Law Group, P.C.
Attorneys for Plaintiffs